**KATSKY KORINS LLP**
605 Third Avenue
New York, New York 10158-0038
(212) 953-6000
Steven H. Newman, Esq.
snewman@katskykorins.com
Robert A. Abrams, Esq.
rabrams@katskykorins.com

*Attorneys for 41-31 Haight Street Lender, LLC*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re                                                                    Chapter 11

41-23 HAIGHT STREET REALTY INC.,                     Case No. 19-43441 (NHL)

                              Debtor.
--------------------------------------------------------x

**MOTION IN SUPPORT OF AN ORDER: (I) APPOINTING A CHAPTER 11 TRUSTEE
PURSUANT TO AN 11 U.S.C. SECTIONS 1104(a)(1) AND (a)(2);
AND (II) GRANTING RELATED RELIEF**

TO:     THE HONORABLE NANCY HERSHEY LORD,
        UNITED STATES BANKRUPTCY JUDGE:

        41-31 Haight Street Lender, LLC ("**Lender**"), by its undersigned counsel, submits this

motion for the entry of an order: (i) appointing a Chapter 11 trustee pursuant to 11 U.S.C. § §

1104(a)(1) and (a)(2), and (ii) granting Lender related relief (the "**Motion**"), and respectfully

states as follows:

## PRELIMINARY STATEMENT

        1.       Like *The Producers'* con artist Max Bialystock, who hatched a fraudulent get rich

scheme by overselling interests in its theatre production, so too did 41-23 Haight Street Realty

Inc. (the "**Debtor**") in connection with the sale of to be constructed residential and commercial

units at the real property known as 41-09 through 41-31 Haight Street, Flushing, New York (the "**Property**").  Indeed, multiple lawsuits have been filed by contract vendees accusing the Debtor and its principals of converting millions of dollars in contract deposits for the Debtor's or its principals own purposes and concurrently selling the *same* residential unit to different purchasers.  The purchasers, including the Petitioning Creditors (defined below), have thus been left in limbo not knowing when, if ever, they will ever obtain possession of the units they purchased and whether they will ever recover the substantial deposits that they paid to the Debtor.  Indeed, the whereabouts of the deposits are unaccounted for and are known only to the Debtor's principals: Bo Jin Zhu and Andy Chau.[1]

2.      In addition, the Debtor is flagrantly committing corporate waste by allowing what the Lender believes to be between $5,000,000.00 and $10,000,000.00 in potentially available Section 421-a tax benefits to disappear like a melting ice cube.  To obtain these valuable benefits, among other things, construction at the Property must be completed by December 31, 2019. However, in or about November 2018, all construction at the Property ceased. Consequently, the Debtor and its entire creditor body are in immediate jeopardy of losing the extraordinarily valuable tax benefits. Lender believes that the Debtor has the ability to obtain these valuable tax benefits if it, among other things, completes construction by year end, obtains temporary certificates of occupancy, and files the necessary applications.  However, the Debtor is sitting on its thumbs and taking no action.  The Debtor has even refused offers by Lender to resolve the stalled project (its principal having sought to extract monetary compensation for an obligation he has a duty to perform), and has also failed to even file a preliminary application for

---

[1]  Mr. Zhu is no stranger to this Court. Indeed, pending before this Court is *In re 1989 3rd Ave LLC* (Case No. 18-47234 (nhl)). In that bankruptcy proceeding, like here, the debtor's Chapter 11 petition reflects that its principal creditors are jilted contract vendees who entrusted millions of dollars in deposits with the Debtor's principals. Thus, there is an apparent theme to this Debtor's *modus operandi*.

the tax abatement.  Accordingly, it is abundantly clear that the Debtor has abandoned all efforts to obtain these financial benefits -- all to the detriment of its creditors.  The Debtor's complete failure to preserve the value of its single asset in order to repay its creditors is nothing short of gross mismanagement which can only be cured by the installation of a Chapter 11 trustee to timely obtain debtor-in-possession financing, complete construction and save these tax abatements.  Because there is now less than a five (5) month window remaining before the Debtor's opportunity to obtain the millions in tax benefits expires on December 31, 2019, an immediate appointment of a Chapter 11 trustee is required.

3.      Also, the Property is uninsured.  In fact, Lender received notification from Lloyds of London that insurance terminated for non-payment on September 10, 2018 - - almost ten (10) months ago, which is a violation of the fully matured mortgage loans encumbering the Property of the Debtor. Thus, the Debtor has no insurance to cover any loss at the Property and creditors are at risk of losing a recovery on account of their substantial claims against the Debtor.[2]

4.      Moreover, as a result of the Debtor's abandonment of all construction, the Property presently presents significant life, health and safety concerns. Among other things, the sole security barring access to the Property is a meager piece of plywood.  This plywood is plainly ineffective from preventing entrance and should squatters or anyone gain access, the Property is fraught with danger as there exists within the building and residential units, among other things, an open elevator shaft, exposed electrical wiring, construction debris strewn about the Property and unlocked doors which serve as a recipe for serious injury or worse.

---

[2] The threat of personal injury claims to the estate is real given the Property's current poorly maintained condition. Indeed, as recently as June 26, 2019, a $988,000 personal injury judgment has been entered against the Debtor due to its negligence and carelessness in maintaining the Property. Upon information and belief, no insurance coverage exists to cover this judgment.

5.      In short, Lender and the Debtor's creditor body have lost all trust in the Debtor's current managers and their ability to timely complete construction. Indeed, the Debtor has already defaulted under its Loans (as defined below) owed to Lender and a foreclosure proceeding is pending. Importantly, however, Lender is eager to engage in discussions with a Chapter 11 trustee who is in the unique position of saving the Section 421-a tax abatements, protecting the Property from claims, asserting claims against Debtor's principals, and potentially salvaging the Debtor from its own wrongful conduct and gross mismanagement.

6.      Cases like this need immediate "stewardship" to ensure that the Debtor's assets are safeguarded and properly administered.  Because the Debtor and its principals appear to have engaged in wasteful, fraudulent, and dishonest conduct, maintaining the present managerial status would be detrimental to the best interests of the Debtor's creditors.  For these reasons and the other reasons set forth below, Lender respectfully requests that the Court immediately appoint a Chapter 11 trustee.

## **BACKGROUND**

7.      As described in greater detail hereinbelow, the Lender is aware of not fewer than seven (7) separate litigations (collectively, the "**State Court Litigations**" and each a "**State Court Litigation**") which are either pending against the Debtor before the Supreme Court for the State of New York, Queens County ("**State Court**"), or have already resulted in the entry of judgments against the Debtor. All State Court Litigations relate to the Debtor's bad acts and/or omissions in connection with its ownership and/or gross mismanagement of the Property.

8.      Five of the State Court Litigations relate to the Debtor's failure and defaults in honoring agreements of sale relating to certain units to contract vendees at the Property, at least two (2) of which have resulted in judgments for specific performance against the Debtor.

9.      In addition, the Debtor is the subject of a personal injury action (State Court Index No. 709069/2017) which resulted in a judgment against the Debtor involving an individual, Matthew Krepil ("**Krepil**"), who was a firefighter that responded to a fire at the Debtor's Property. As detailed below, by Inquest Decision, Judgment and Order (the "**Krepil Judgment**") Krepil was awarded the sum of $988,000.00 against the Debtor for his pain and suffering while, upon information and belief, the Debtor did not maintain any liability insurance.

10.     Finally, the Debtor is the subject of a pending foreclosure action commenced by the Lender as described in the accompanying Declaration of Edward Martell, dated July 15, 2019 (the "Martell Declaration").

**A.**    <u>**Lender Is Foreclosing on the Property Based on Debtor's Defaults**</u>

11.     In connection with the Debtor's acquisition and construction of eleven (11) multifamily town homes consisting of approximately sixty-one (61) residential and twenty-three (23) commercial units at the Property, on or about April 18, 2017, the Lender's predecessor-in-interest, G4 18171 LLC ("**G4**"), the Debtor and Bo Jin Zhu, as guarantor (the "**Guarantor**") entered into a commercial loan transaction wherein the Debtor borrowed and agreed to repay the principal sum of Nine Million Five Hundred Thousand ($9,500,000.00) Dollars and 00/100 Cents plus interest thereon (the "**First Loan**").  To memorialize the First Loan, the Debtor duly executed, acknowledged, and delivered to G4, a Consolidated, Amended and Restated Secured Promissory Note (the "**First Note**"), evidencing the indebtedness to Lender. A true copy of the First Note, together with an attached allonge in favor of Lender, is attached as <u>**Exhibit 1**</u> hereto.

12.     Simultaneous with the execution and delivery of the First Note, the Debtor, as mortgagor, duly executed, acknowledged, and delivered to Lender, among other things, a certain Consolidated, Amended and Restated Mortgage, Assignment of Leases and Rents and Security

Agreement (the "**First Mortgage**") that set forth the terms and conditions of the First Loan. A true copy of the First Mortgage is attached as **Exhibit 2** hereto.  The First Mortgage constitutes a first priority lien encumbering Debtor's fee ownership in the Property and evidencing the indebtedness. The First Mortgage was assigned by G4 to Lender by Assignment of Mortgage (the "**First Mortgage Assignment**") dated as of August 30, 2018. A true copy of the First Mortgage Assignment is attached as **Exhibit 3** hereto.

13.     On or about May 26, 2017, G4, the Debtor and Guarantor entered into a second commercial loan transaction whereby G4 advanced a building loan in the amount of One Million Seven Hundred Fifty Thousand Dollars ($1,750,000.00) and 00/100 Cents (the "**Second Loan**" or "**Building Loan**"; and together with the First Loan collectively referred to herein as the "**Loans**").

14.      In connection with the Second Loan, G4 and the Debtor entered into a Building Loan Agreement dated May 27, 2017.  A true copy of the Building Loan Agreement is attached as **Exhibit 4** hereto.

15.     Simultaneous with the execution and delivery of the Building Loan Agreement, the Debtor executed, acknowledged, and delivered to G4, a Building Secured Promissory Note (the "**Second Note**"; and together with the First Note collectively referred to herein as the "**Notes**"), evidencing the indebtedness of One Million Seven Hundred Fifty Thousand Dollars ($1,750,000.00) and 00/100 Cents.  A true copy of the Second Note, together with an allonge in favor of Lender, is attached as **Exhibit 5** hereto.

16.     Simultaneous with the execution and delivery of the Building Loan Agreement and the Second Note and for the purpose of securing payment of said Second Loan indebtedness and performance of the Second Note, the Debtor, as mortgagor, duly executed, acknowledged,

and delivered to Lender, among other things, a certain Building Mortgage, Assignment of Leases and Rents and Security Agreement (the "**Second Mortgage**") in the original principal amount of One Million Seven Hundred Fifty Thousand Dollars ($1,750,000.00) and 00/100 Cents plus interest.  A true copy of the Second Mortgage is attached as **Exhibit 6** hereto.  The Second Mortgage constitutes a second priority lien encumbering the Debtor's fee ownership in the Property and evidencing the indebtedness due under the Second Loan.   The Second Mortgage was thereafter assigned by G4 to Lender by Assignment of Mortgage (the "**Second Mortgage Assignment**") dated as of August 30, 2018. A true copy of the Second Mortgage Assignment is attached as **Exhibit 7** hereto.

17.      The Debtor defaulted under the Loan Documents [3] in numerous respects, including, but not limited to, (i) failing to repay the indebtedness due under the Loans when they each matured by their terms on November 1, 2018, (ii) failing to fund the Tax and Insurance Escrow Fund (as defined in the Loan Documents), (iii) failing to pay property taxes for the Property since January 1, 2018, and (iv) failing to keep the Property insured (collectively, the "**Defaults**"). Indeed, by notice dated August 22, 2018, Lender received a Notice of Cancellation of Insurance from the insurer, Lloyds London, confirming that as of September 10, 2018, the commercial insurance coverage for the Property terminated due to non-payment, a copy of which notice is attached as **Exhibit 8** hereto.

18.      By letter dated September 6, 2018, Lender, among other things, (i) provided written notice to the Debtor of the Debtor's multiple Defaults under the Loan Documents, (ii) accelerated both Loans, and (iii) demanded payment in full of all amounts due under the Loans. A true copy of Lender's September 6, 2018 default letter is attached as **Exhibit 9** hereto. In all

---

[3] The "Loan Documents" include the First Note, the First Mortgage, the Loan Agreement, the Second Note, the Second Mortgage, the Guarantees, and related loan documents.

events, both Loans fully matured by their respective terms on November 1, 2018, and the indebtedness due thereunder has not been repaid.

19.     On October 22, 2018, Lender filed a Verified Complaint for Foreclosure of Commercial Mortgages ("**State Court Complaint**") in the State Court, Index No. 716119/2018 ("**State Court Action**").  A true copy of the State Court Complaint, without exhibits, is attached as **Exhibit 10** hereto.

**B**.     **The  Commencement of This Case**.

20.     On June 4, 2019, Wen Mei Wang a/k/a Amy Johnson ("**Johnson**"), Xian Kang Zhang ("**Zhang**"), Yu Qing Wang ("**Wang**"; and together with John and Zhang, collectively referred to herein as the "**Petitioning Creditors**") filed the instant involuntary Chapter 11 proceeding against the Debtor.

21.     On June 11, 2019, the Petitioning Creditors filed proof of service of the Summons and Petition [ECF Nos. 3 & 4] upon the Debtor, requiring the Debtor to answer by July 2, 2019.

22.     In response, on June 30, 2019, the Debtor filed its Motion to Dismiss the instant action [ECF No. 6] (the "**Debtor's Motion**"), which, *inter alia*, fails to contain (a) any statement from anyone with personal knowledge of the facts and allegations set forth therein, or (b) any case law or statutory authority for the inaccurate and misguided proposition that the Petitioning Creditors lack standing to have filed the Petition in the first instance.

23.     In nearly all of the aforementioned State Court litigations, the Debtor, by counsel, filed its Notice of Involuntary Bankruptcy Filing and of the Automatic Stay, wherein it alerted each of its adversaries that their action was stayed.

24.     Notwithstanding the flimsy allegations set forth in the Debtor's Motion, the Debtor failed to meet its burden, and for each of the reasons set forth below, good causes exists

for the immediate appointment of a Chapter 11 Trustee.

**CAUSE EXISTS FOR THE IMMEDIATE
APPOINTMENT OF A CHAPTER 11 TRUSTEE**

25.     As set forth below, "cause" exists for the prompt appointment of a Chapter 11 trustee due to, among other things, the Debtor's fraudulent conduct, the waste of the Debtor's readily available opportunity to realize between $5,000,000 and $10,000,000.00 in Section 421-a tax benefits, and its gross mismanagement of the Property, including its lack of insurance, which presents serious life safety issues.

**A.      The Debtor's Fraudulent Conduct**

26.     As set forth herein below, the Debtor and its principals are the subject of number litigations which contain very serious allegations about the Debtor and its principals engaging in fraudulent schemes to raise money through which the Debtor intentionally took advantage of certain contract vendees by entering into multiple contracts of sale (and accepting significant deposits from such vendees) for the very same realty.  In other litigations, the Debtor simply took the contract vendees' substantial contract deposits, breached its obligations to perform, and left the purchasers in the lurch.

**(1) The Debtors' Contracts With The Petitioning Creditors And With WLZ**

27.     According to a verified complaint styled *Amy Johnson a/k/a Wen Mei Wang v. 41-23 Haight Realty, Inc., Bo Jin Zhu, and Andy Chau*, Index No. 709682/2018 (the "**Johnson Action**"), a copy of which is attached as **Exhibit 11** hereto, on or about March 10, 2010, the Debtor, on the one hand, and the Petitioning Creditors, on the other, entered into a Residential Contract of Sale for a $992,000 purchase price (the "**Petitioning Creditors' Contract**"). In connection with the sale, the Petitioning Creditors paid $450,000 to the Debtor in deposits. Moreover, consistent with the Contract, the Petitioning Creditors also paid the Debtor $110,000

9

installments on or about October 8, 2014, July 30, 2015, August 27, 2015, and October 26, 2015, and paid their last $102,000 installment on November 30, 2015. In other words, as of November 30, 2015, the Petitioning Creditors paid the full purchase price required under the Debtor's Contract with them.

28.     According to a verified complaint styled *WLZ New York LLC v. 41-23 Haight Realty, Inc., Bo Jin Zhu, and Andy Chau*, Index No. 701824/2016, a copy of which is attached as **Exhibit 12** hereto, on March 10, 2010, the Debtor, on the one hand, and Zhong You Wang and Xiu Chai Lu, on the other, entered into a Residential Contract of Sale (the "**WLZ Contract**"). Like the Petitioning Creditors, Zhong You Wang and Xiu Chai Lu paid $450,000 in deposits to the Debtor. The Debtor and Zhong You Wang and Xiu Chai Lu subsequently entered into an agreement whereby the buyer's name was changed to WLZ New York LLC ("**WLZ**").

29.     The Petitioning Creditors and WLZ assert in their respective complaints, among other things, that construction was never completed, neither of the contracts closed, and the $450,000 in deposits plus the $542,000 balance of the purchase price paid to the Debtor from the Petitioning Creditors and $450,000 in deposits from WLZ are unaccounted for. Thus, the Debtor left these contract vendees without a residence and without their substantial deposits and subsequent installments. It cannot be credibly contested that the closing of these contracts never occurred and these monies have not been returned, together with liquidated damages as provided for in their respective contracts.

### (2) The Debtor's Contracts With Chen and Zheng

30.     Consistent with its conduct, the Debtor entered into another contract to sell a unit at the Property taking in a $900,000 deposit and then leaving the purchaser without a residence and without its downpayment. According to a verified complaint styled *Wei X. Chen v. 41-23*

*Haight Street Realty Inc., Wing Fung Chau a/k/a Andy Chau, Hok Kwai Chau, and Bo Jin Zhu*, Index No. 704522/2018, a copy of which is attached as **Exhibit 13** hereto, in or about June 2016, the Debtor, on the one hand, and Wei X. Chen, on the other, entered into a purchase agreement for the sale of a unit at the Property (the "**Chen Contract**").  Like the Debtor's lack of performance in connection with the Petitioning Creditors' Contract and the WLZ Contract, the construction of the Chen property was never completed, the Chen Contract never closed, and the $900,000 in deposits from Chen have allegedly disappeared. Like the contracts with the Petitioning Creditors and with WLZ, it cannot be credibly disputed that the Debtor never consummated the sale to Chen and that Chen's deposit was never returned.

31.    In addition, according to a verified complaint styled *Li Fang Zheng v. 41-23 Haight Street realty Inc., Wing Fung Chau a/k/a Andy Chau, Hok Kwai Chau, and Bo Jin Zhu*, Index No. 704528/2018, a copy of which is attached as **Exhibit 14** hereto, in or about June 2016, the Debtor, on the one hand, and Li Fang Zheng, on the other, entered into a purchase agreement for the sale of a unit at the Property (the "**Zheng Contract**").  Like the Chen Contract, Zheng delivered to the Debtor a $900,000 downpayment. Once again, the Debtor failed to close on the sale and never returned the deposit to Zheng.

32.    Importantly, both Chen and Zheng allege in their separate complaints that not only did the Debtor fail to close and return the deposits to them, they also allege that the Debtor committed a blatant fraud by entering into two (2) other contracts with two (2) different buyers to sell the very same units to other contract vendees. *See*, **Exhibit 13** and **Exhibit 14** hereto, at ¶ 13 in each.  Thus, there are substantial claims that the Debtor duped Chen and Zheng and never intended (or had the ability) to sell the units to Chen and Zheng and the Debtor's intent was to convert their deposits.

33.    In summary, Chen and Zheng have alleged that the Debtor and its principals committed fraud and breached their obligations to deliver title to units at the Property and have allegedly swindled these two (2) contract vendees out of $1,800,000 deposits.[4]

### (3)  **The Debtor's Contract with LDWS and T.8.J. LLC**

34.    According to a complaint by LDWS LLC ("**LDWS**") and T.8.J. LLC ("**T8J**") filed with the State Court in September 2015, Index No. 709188/2015(the "**LDWS/T8J Complaint**"), a true and correct copy of which (without exhibits) is attached as **Exhibit 15** hereto, the Debtor entered into two separate Residential Contracts of Sale with (i) LDWS and (ii) T8J (as assignee of 41-158 Flushing Realty Inc.). While LDWS and T8J had separate claims under separate contracts, both claims were brought under one index number as the facts and circumstances concerning the claims were largely the same. Both LDWS and T8J sought specific performance as a result the Debtor's failure to deliver title to the units that the Debtor was under contract to convey. At the conclusion of that litigation, the Court entered Judgment in favor of LDWS and T8J and ordered that the Debtor specifically perform on payment of the $200,000 balance owed under each contract. A copy of the Judgment is attached as **Exhibit 16** hereto.

### B.    **The Debtor Is Wasting Valuable Section 421-a Tax Credits**

35.    The New York City Department of Housing Preservation and Development ("**HPD**") offers substantial Section 421-a tax abatements to building owners who construct new multi-family housing units in certain designated areas, including in Queens where the Property is located.  Lender believes that the Property qualifies for significant tax exemptions pursuant to

---

[4]  We note that the Debtor filed answers in the Johnson action, the Chen action, and the Zheng action, which generally denied all allegations and asserted what appear to be wholly meritless counterclaims.  The answers are bare boned and appear to have been filed to hinder and delay the plaintiffs therein. There can be no credible dispute that (i) the plaintiffs in each of these actions entered into contracts with the Debtor and paid security deposits to the Debtor to have the Debtor build houses and convey title thereto, (ii) the Debtor failed to complete construction, (iii) the Debtor failed to convey title to the plaintiffs, and (iv) the Debtor failed to return the security deposits and pay other liquidated damages to the applicable plaintiffs pursuant to the contracts.

Section 421-a of the New York Real Property Law (the "**Tax Exemption**") and the Debtor can obtain these benefits if immediate actions are taken.  Section 421-a awards a tax exemption to building owners who construct new multi-family housing in designated areas of New York City, provided that, among other things: (i) the development occurs on vacant, predominately vacant, or underutilized land, or land improved with a non-conforming use; (ii) at least 20% of the units are designated for affordable housing subject to rent stabilization; (iii) the owner files a request for the exemption prior to the completion of construction; and (iv) the owner completes construction of the property and obtains a temporary certificate of occupancy by or before December 31, 2019. The value of the Section 421-a Tax Exemption is enormous, since the owner pays property taxes based on the pre-construction assessed value of the Property during the construction period and then thereafter throughout the period of the exemption, which is approximately 25 years.

36.     Indeed, Lender estimates that if the Debtor completes construction by year end and obtains the Tax Exemption, it would have the effect of increasing the value of the Property by a sum between $5,000,000.00 and $10,000,000.00. *See*, Martell Declaration, ¶¶ 30.

37.     Upon information and belief, all of the proceeds from Lender's Loans have been exhausted by the Debtor at this time, which is one of the reasons that construction came to a halt. Lender estimates that (i) it will cost approximately $1,000,000 to $2,000,000.00 and (ii) take approximately sixty (60) days to complete construction once construction is restarted. Given that there is less than five (5) months until year end, without immediate action, the value of the Tax Exemption will completely and forever vanish, to the detriment of Lender, all other creditors of the Debtor, and the Debtor itself.

38.     To the point, the Debtor is engaging in corporate waste since the Debtor stopped all construction approximately nine months ago and failed to file even a preliminary application with HPD for the Section 421-a tax exemption. It is simply letting this valuable asset rot away. In fact, as contained in the Martell Declaration, at a meeting at Lender's office ON October 29, 2018, the Lender attempted to suggest various possible exit strategies to the Debtor, but the Debtor's principal advised that the Debtor had exhausted all funds in its possession and refused to complete construction unless he extracted several million dollars from Lender for himself and to the detriment of the Debtor's creditors. See, Martell Declaration ¶¶ 32-33. It is respectfully submitted that there can be no good faith reason for the Debtor to sit on its thumbs, let the clock run, and allow the value of the Tax Exemption to disappear.

39.     If an interim operating Chapter 11 Trustee is quickly appointed, that fiduciary could take immediate action (with the assistance and consent of Lender) to obtain debtor-in-possession financing, complete the construction project, and salvage millions of dollars in value of the tax exemption, for the benefit of all parties. It would be a win-win result.  In addition, the trustee can investigate and pursue claims against the Debtor's principals for their mismanagement, misfeasance, non-feasance, corporate waste and the diversion of the millions in deposits received from the multiple contract vendees for the Property.

**C.      The Property Currently Presents Life, Health and Safety Issues**

40.     Debtor's gross mismanagement of the Property is not limited to its failure to obtain substantial tax abatements and apparent fraud on purchasers.  As set forth in the Martell Declaration submitted hereto, the condition of the Property itself is a present and significant danger to the community. There is no water for fire protection and no electricity for fire alarms, the Property is strewn with trash and other debris, the partially-constructed buildings have

multiple broken windows and entrances are either not secured at all or could be accessed with minimal effort by the public. If any person goes into the Property, the building itself is a life safety hazard as there is an open elevator shaft and loose wiring. *See*, Martell Declaration ¶¶ 18-29, 31.

41.     The threat to the general public is very real.  Indeed, as recently as June 26, 2019, the Court entered a $988,000 judgment against the Debtor and in favor of Krepil, a firefighter who responded to a fire at the Debtor's Property. Due to the haphazard manner in which the Property was maintained, a fire erupted within a pile of construction debris and ultimately left Krepil seriously and permanently injured while, upon information and belief, the Debtor did not maintain any liability insurance. Ultimately, by Inquest Decision, Judgment and Order (the "**Krepil Judgment**") Krepil was awarded the sum of $988,000.00 against the Debtor for his pain and suffering.  A copy of the Krepil Judgment is attached as **Exhibit 17** hereto.

D.      **No Insurance Exists**.

42.     Importantly, Lender has learned that the Debtor's insurance was cancelled for non-payment of premiums in September 2018 - - almost ten (10) months ago. *See*, **Exhibit 8** hereto. Thus, to the extent that any injury occurs at the Property - - which is unprotected and presenting life safety issues, as described above - -, the Debtor is subject to substantial claims. For this reason alone, a Chapter 11 trustee is urgently needed to secure the Property and mitigate harm to the community.

## A CHAPTER 11 TRUSTEE SHOULD BE APPOINTED
## UNDER BOTH SECTIONS 1104(A)(1) AND (2) OF THE BANKRUPTCY CODE

43.     Lender seeks the appointment of Chapter 11 trustee pursuant to §§ 1104(a)(1) and (a)(2) of the Bankruptcy Code.  Section 1104 provides, in relevant part:

(a) At any time after the commencement of the case but not before

confirmation of a plan, on request of a party in interest or the
United States trustee, and after notice and a hearing, the **court
shall order** the appointment of a trustee –

> (1) for cause, including fraud, dishonesty, incompetence, or
> gross mismanagement of the affairs of the debtor by current
> management, either before or after the commencement of
> the case, or similar cause... or

> (2) in such appointment is in the best interest of creditors,
> any equity security holders, and other interests of the
> estate...

11 U.S.C. §§ 1104(a)(1) and (a)(2). (Emphasis supplied).

44.     As this Court noted, "Section 1104(a) is phrased in the disjunctive, meaning that

there are two discrete predicates for the appointment of a reorganization trustee.  Such

appointment is authorized upon a showing of cause, as defined, or demonstration that the

appointment is in the interests of the parties.  Once the court has found that cause exists under §

1104(a)(1); there is no discretion; an independent trustee must be approved." In re V. Savino Oil

& Heating Co., Inc., 91 B.R. 518, 525 (Bankr. E.D.N.Y. 1989).  *See also*, In re Anchorage Boat

Sales, Inc., 4 B.R. 635, 644 (Bankr. E.D.N.Y. 1980) (Under § 1104(a)(1), the court's

discretionary powers are circumscribed and limited to a judicial determination of whether

"cause", as enumerated, exists).  This Court further noted that "the willingness of Congress to

leave a debtor-in-possession is premised on an expectation that current management can be

depended upon to carry out the fiduciary responsibilities as a trustee.  And if the debtor-in-

possession defaults in this respect, Section 1104(a)(1) commands that the stewardship of the

reorganization must be turned over to an independent trustee". In re V. Savino Oil & Heating,

91 B.R. at 526.  *See also*, In re U.S. Communications, 123 B.R. 491, 495 (Bankr. S.D.N.Y. 1991)

(appointing trustee where debtor engaged in conduct revealing "a lack of competence to conduct

a business operation in furtherance of its fiduciary duty to creditors").  Alternatively, subsection

(a)(2) permits the court to appoint a trustee in the interests of creditors and grants the court wide discretion to determine justification for the appointment. In re Ionosphere Clubs, Inc., 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990).

45.    While the statute expressly cites fraud, dishonesty, incompetence, and gross mismanagement, grounds for appointing a chapter 11 trustee for cause are not limited to these specifically enumerated derelictions.  In re V. Savino Oil & Heating, 91 B.R. at 525. Indeed, the list of wrongs constituting "cause" that warrants the appointment of a trustee is not exhaustive; some other "[f]actors relevant to the appointment of a trustee under § 1104(a)(1) include: conflicts of interest, including inappropriate relations between corporate parents and the subsidiaries; misuse of assets and funds; inadequate record keeping and reporting; various instances of conduct found to establish fraud or dishonesty; and lack of credibility and creditor confidence." In re Ashley Riv. Consulting, LLC, 14-13406 (MG), 2015 WL 1540941, at *9 (Bankr. S.D.N.Y. Mar. 31, 2015)

46.    In In re V. Savino Oil & Heating, the Bankruptcy Court found that the timing, together with facts and circumstances surrounding the formation of a second corporation prior to a bankruptcy proceeding, "represented a calculated and calibrated effort in contemplation of the Chapter 11 filing to place the Debtor's retail fuel operations beyond the reach of creditors."  Id, 91 B.R. at 526.  The Bankruptcy Court therefore found that "[t]his pre-petition course of conduct, in and of itself, constitutes 'cause' for the appointment of a Chapter 11 trustee". Id.  See also, In re PRS Insurance Group, Inc., 2001 Bankr. LEXIS 220, at *10 (Bankr. Del. 2001) (diversion of funds and misuse of corporate assets constitute fraud or dishonesty sufficient to warrant appointment of a trustee under section 1104(a)(1)); In re Intercat, Inc., 247 B.R. 911 (Bankr. S.D. Ga. 2000) (trustee appointed where debtor's director paid compensation to himself

by making loans without repayment, personal travel expenses were charged to debtor, exhibiting incompetence or mismanagement, and debtor's intellectual property assets were transferred to one of the director's insider companies); In re Bibo, Inc., 76 F.3d 256, 257-78 (9th Cir. 1996) (appointment of a trustee was mandated where management had siphoned funds from the debtor through kickbacks); In re Sharon Steel Corp., 871 F.2d 1217, 1226 (3d Cir. 1989) (systematic siphoning of debtor's assets to other companies under shareholder's common control constituted cause for appointment of trustee); In re McCorhill Publishing, Inc., 73 B.R. 1013 (Bankr. S.D.N.Y. 1987) (chapter 11 trustee should be appointed in best interest of creditors where there are questionable inter-company financial transfers); In re Colby Constr., Inc., 51 B.R. 113, 116 (Bankr. S.D.N.Y. 1985) (majority shareholder's "deliberate and unabashed conversion of corporate assets to acquire another company in his own name indicates the scienter implicit in fraud as that term is used in § 1104(a)(1) or at least the dishonest contemplated by that section").

47.     Here, it cannot be credibility disputed that the Debtor cannot be trusted with contract vendee deposits. The Debtor received $450,000.00 in deposits from the Petitioning Creditors (plus the $542,000 balance under their contract of sale), $450,000.00 in deposits from WLZ, $900,000.00 in deposits from Chen, and $900,000.00 in deposits from Zheng. In all, the Debtor has received at least $3,242,000 in connection with the contracts of sale, and despite the contract vendees' performance under their respective agreements, the Debtor has failed to deliver title and has further failed to return the contract vendee deposits.  To the point, the deposits were plainly converted for the Debtor's own self-interested purposes.

48.     Moreover, the Debtor is wasting a valuable opportunity to obtain Section 421-a tax abatements which would increase the value of the Property and Lender's collateral by at least $5,000,000.  To obtain such tax abatements, among other things, construction must be completed

at the Property by December 31, 2019.  Here, however, the Debtor has apparently abandoned all efforts to complete construction because construction at the Property stopped in November 2018. Thus, time is short. The Debtor and its management, through their past bad acts and conduct, have proven to be wholly unreliable and untrustworthy to complete construction and bring value to the estate. While Lender will not provide any more monies to the Debtor, it is willing to engage in discussions with a Chapter 11 trustee to fund construction so that the estate enjoys the benefits afforded under HPD's Section 421-a abatement program.

49.      As noted, the Debtor has abandoned construction and has not taken steps to protect the Property and community from danger. There exists a fire hazard because there is no water for fire protection and no electricity for fire alarms. Additionally, the building situated on the Property has multiple broken windows and entrances are not properly secured. If the Property is accessed, the building itself is a hazard as there exists an open elevator shaft and loose wiring. Importantly, Lender has learned that the Debtor's insurance was cancelled for non-payment of premiums in September 2018.  Thus, to the extent that any injury occurs at the Property, the Debtor is subject to substantial claims.

50.      For all of the foregoing reasons, when taken together, "cause" exists under § 1104(a)(1) of the Bankruptcy Code for the immediate appointment of a Chapter 11 trustee.

51.      In the unlikely event that the Court were to find that no "cause" exists under Section 1104(a)(1), the Court should still appoint a trustee in this case under Section 1104(a)(2) because a trustee is "in the best interest of creditors".  Section 1104(a)(2) does not require a finding of cause.  *See, e.g.,* In re Marvel Entm't Group, Inc., 140 F.3d 463, 474 (3rd Cir.1998) (the court may appoint a trustee even if no "cause" exists); Sharon Steel Corp., 871 F.2d at 1226; *Ionosphere Clubs, Inc.,* 113 B.R. at 168. The Court has broad discretion, (Id.), and at

bottom, "it seems that § 1104(a)(2) reflects 'the practical reality that a trustee is needed.' " In re Ridgemour Meyer Properties, LLC, 413 BR 101, 113 (Bankr. S.D.N.Y. 2008) *citing* V. Savino Oil & Heating Co., Inc., 99 B.R. at 527 n. 11 (*quoting* Sharon Steel Corp., 86 B.R. 455, 458 (Bankr.W.D.Pa.1988)).

52.     In this case, for the very same reasons why "cause" exists to appoint a Chapter 11 trustee pursuant to Section 1104(a)(1), the appointment of a Chapter 11 trustee is necessary pursuant to Section 1104(a)(2) because it is "in the best interests of creditors."

53.     The Debtor and its principals have proven to be dishonest and the practical reality is that the Debtor cannot be trusted to faithfully steer itself through a reorganization. *See e.g.*, In re V. Savino Oil & Heating, 99 B.R. 5276, fn 11 (where it appears that "no meaningful progress towards reorganization is possible because of deep rooted animosities between a Debtor and major creditors, an independent reorganization trustee may well be necessary to insulate the reorganization process from paralytic conflict").  Accordingly, based upon the evidence thus far revealed, the appointment of a trustee is required in this case under either Section 1104(a)(1) or Section 1104(a)(2).

54.     Here, there is no expectation that current management can be depended upon to carry out the fiduciary responsibilities as a trustee.  In fact, there exists evidence of fraud, dishonesty, incompetence and gross mismanagement, all of which requires that the stewardship of the reorganization be turned over to an independent trustee.

## **CONCLUSION**

For the reasons set forth above, Lender respectfully requests that the Court enter an order:

(i) directing the appointment of a Chapter 11 trustee; and (ii) granting such other and further

relief as the Court deems just and proper.

Dated:  New York, New York
         July 22, 2019

                                KATSKY KORINS LP


                                By: */s/ Robert A. Abrams*
                                    Steven H. Newman, Esq.
                                    Robert A. Abrams, Esq.
                                605 Third Avenue
                                New York, New York 10158-0038
                                (212) 953-6000
                                *Attorneys for 41-31 Haight Street Lender, LLC*